**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KT STATE & LEMON LLLP and
KAST CONSTRUCTION IV, LLC,

      Plaintiffs,

v.                              Case No: 8:21-cv-1941-TPB-AAS

WESTCHESTER FIRE INSURANCE
COMPANY and NORTH AMERICAN
CAPACITY INSURANCE COMPANY,

      Defendants.

_____ /

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on "Plaintiffs' Motion for Summary

Judgment, Incorporated Statement of Facts and Memorandum of Law" (Doc. 36),

and "Defendants' Motion for Summary Judgment and Supporting Memorandum of

Law" (Doc. 38), both filed on October 17, 2022.   Each side filed a response in

opposition to the other side's motion and filed a reply in support of its own motion.

(Docs. 39; 40; 42; 43).   The Court heard argument on the cross-motions on January

5, 2023.   Upon review of the motions, responses, replies, court file, and the record,

the Court finds as follows:

**Background**

Plaintiff KT State and Lemon, LLLP ("KT State") owned an eleven-story,

Page 1 of 14

mixed-use residential and commercial building under construction in Sarasota, Florida.   KT State hired Kast Construction IV, LLC ("Kast") as general contractor for the construction.   Defendants Westchester Fire Insurance Company and North American Capacity Insurance Company provided insurance for the project under two builder's risk policies (the "Policies") issued to KT State with Kast as an additional insured.   Westchester assumed 60 percent of the risk and North American assumed 40 percent.   The Policies provided that "LOSS in any one OCCURRENCE caused by or resulting from WATER DAMAGE" would be subject to a deductible of $50,000.   Originally the Policies provided coverage from April 11, 2018, to November 30, 2019, but Plaintiffs negotiated an extension of the coverage period to January 30, 2020, in exchange for increasing the deductible for water damage to $250,000 per occurrence.

Kast hired Critical Systems Solutions ("CSS") to install and test the fire suppression system throughout the building.   A vertical section of the building containing multiple units was used to hoist materials and equipment and store them for use in completing the other sections.   This section was the last to be completed and the last section in which the CSS crew installed and tested the sprinkler system.   Leaks in the system causing water damage occurred in this section on September 20, 2019, September 23, 2019, October 3, 2019, and November 21, 2019, and in an adjacent vertical section on December 14, 2019, and December 23, 2019.

Plaintiffs have submitted insurance claims to Defendants seeking to recover (1) the cost to have subcontractors repair the leaks and water damage, (2) Plaintiffs' management and supervision costs incurred to supervise the repairs, (3) overhead and profit, and (4) a contractual penalty imposed due to the delay in completing the project. Plaintiffs contend that the leaks together constituted one "occurrence" that began on the date of the first leak, and therefore the entire loss Plaintiffs suffered was subject to a single deductible of $50,000. Plaintiffs argue that after applying the $50,000 deductible and Defendants' payment of $269,180.37, there is still over $700,000 owing on their claims.

Defendants argue that each leak constituted a separate "occurrence," and accordingly a $50,000 deductible applied to each leak up until the date the Policies were extended, after which the deductible for each leak became $250,000. Defendants also argue that Plaintiffs' management, supervision, and contractual penalty costs are not covered. Under Defendants' reading, the only leak for which repair costs exceeded the applicable deductible occurred on December 14, 2019. After applying a $250,000 deductible to that loss, Defendants contend the $269,180.37 they paid for repair costs associated with that leak satisfied their obligations under the Policies, and that nothing further is owed.

Plaintiffs filed a complaint in state court seeking a declaratory judgment and damages for breach of contract. Defendants removed the case to this Court, and the parties have filed cross-motions for summary judgment reflecting the

contentions set forth above.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A properly supported motion for summary judgment is not defeated by the existence of a factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Only the existence of a genuine issue of material fact will preclude summary judgment. *Id.*

The moving party bears the initial burden of showing that there are no genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

The standard for cross-motions for summary judgment is not different from the standard applied when only one party moves for summary judgment. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion separately, resolving all reasonable inferences

against the party whose motion is under consideration. *Id*. "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)).

Federal courts apply state law in construing insurance policies, and the parties agree that Florida law governs this dispute. *See Travelers Indem. Co. v. PCR Inc.*, 326 F.3d 1190, 1193 (11th Cir. 2003). In Florida, the contract should be "construed according to the plain language of the policy," and any ambiguities must be "construed against the insurer and in favor of coverage." *Desai v. Navigators Ins. Co.*, 400 F. Supp. 3d 1280, 1288 (M.D. Fla. 2019) (citing *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)); *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003). An ambiguity exists where the relevant policy language is susceptible of more than one reasonable interpretation, after applying the ordinary rules of construction. *See, e.g., Travelers Prop. Cas. Co. of Am. v. Salt 'N Blue LLC*, 731 F. App'x 920, 923-25 (11th Cir. 2018) (citing *Taurus Holdings*, 913 So. 2d at 532). Insurance contracts are to be read in a common-sense and natural manner. *See Travelers Indem. Co. of Conn. v. Richard McKenzie & Sons, Inc.*, 10 F.4th 1255, 1264 (11th Cir. 2021).

It is well-settled that "the interpretation of an insurance policy is a question

of law to be decided by the Court." *Desai*, 400 F. Supp. 3d at 1288 (citing *Goldberg v. Nat'l Union Fire Ins. Co. of Pittsburgh PA*, 143 F. Supp. 3d 1283, 1292 (S.D. Fla. 2015)); *see also Chestnut Associates, Inc. v. Ass. Co. of Am.*, 17 F. Supp. 3d 1203, 1209 (M.D. Fla. 2014); *Szczeklik v. Markel Int'l Ins. Co.,* 942 F. Supp. 2d 1254, 1259 (M.D. Fla. 2013).

<u>Analysis</u>

The cross-motions for summary judgment present two overarching issues. The first issue is whether each of the sprinkler system leaks that took place from September to December 2019 constituted a separate "occurrence" subject to a separate deductible.   The second issue is whether Plaintiffs can recover costs of management, supervision, and contractual penalties related to the leaks, in addition to their direct repair costs.

*"One Occurrence"*

As noted above, the Policies provide for a $50,000 deductible for "LOSS in any one OCCURRENCE caused by or resulting from WATER DAMAGE."   Plaintiffs contend that the leaks at issue, taken together, constituted one occurrence under the Policies, subject to a single deductible of $50,000.   Defendants contend that each leak constituted a separate occurrence, subject to a separate deductible of $50,000 for leaks occurring prior to November 30, 2019, and $250,000 for the leaks that occurred thereafter.

The Court begins with the relevant policy language.   The Policies contain a

definition of "occurrence" that expressly provides when "one OCCURRENCE" is

deemed to have taken place:

> All LOSS attributable directly or indirectly to one originating cause, event, incident or repeated exposure to the same originating cause, event or incident, or to one series of similar originating causes, events, incidents or repeated exposures to the same originating cause, event or incident first occurring in the Policy period. All such LOSS will be treated as one OCCURRENCE, unless a specified period of time is included in this Policy. The most the Company will pay for LOSS in any one OCCURRENCE is the applicable Limit of Insurance shown on the Declarations.

Under this provision, loss attributable "*directly or indirectly*" either to (1) "one

originating cause, event, [or] incident" *or* to (2) "one *series* of *similar* originating

causes, events, [or] incidents . . . first occurring in the Policy period," constitutes one

occurrence, unless the insurer limits its exposure by the inclusion of a "specified

period of time" in the policy.   Neither "series" nor "similar" is defined in the

Policies, but the terms are neither technical nor obscure.   The dictionary meaning

of "series" is "[a] number of things of one kind (freq. abstract, as events, actions,

conditions, periods of time) following one another in time or in logical order."

*Shorter Oxford English Dictionary* 2762 (6th ed. 2007); *see also RLI Ins. Co., Inc. v.

Carr*, No. 8:14-cv-2246-T-35-MAP, 2016 WL 7320911, at *5 (M.D. Fla. Jan. 22,

2016) (noting that the proffered dictionary meanings of "series" required "(1) a

number of things, (2) of the same or a similar kind (3) coming one after

another").   The dictionary meaning of "similar" is "alike in substance" or "having

characteristics in common."   *Southern-Owners Ins. Co. v. Easdon Rhodes & Assoc.,*

*LLC*, 872 F.3d 1161, 1165 (11th Cir. 2017) (quoting *Merriam-Webster's Collegiate Dictionary* 1093 (1099)); *see also Shorter Oxford English Dictionary* at 2838 (defining "similar" as "[h]aving a resemblance or likeness; having the same nature or kind").

Reading the policy language from the standpoint of an ordinary person, in light of the common meaning of the terms used, and in a common-sense and natural manner produces only one reasonable conclusion.   Plaintiffs' claimed loss was attributable, directly, or indirectly, to a "*series* of *similar* originating causes, events, [or] incidents," and therefore resulted from one occurrence.   The loss resulted from leaks in the same sprinkler system, due in whole or part to improper installation by the same CSS crew under the same contract, in the same general location in the same building, and occurred one after the other in a relatively short span of time from late September to December 2019.[1]

Defendants argue that the events were not "similar" and did not constitute a "series" by pointing to (relatively minor) differences in the specific causes of the leaks and to the fact that the leaks occurred over a period of some 90 days (with

---

[1] Plaintiffs' experts attribute these leaks to improper gluing or fitting of the components of the sprinkler system, in violation of proper methodology and the manufacturer's guidelines for installing the system.   Defendants' expert agrees that improper installation at least contributed to the leaks.   As to the one of the leaks, Defendants' expert's report states that post-installation tampering or "hanging on" to the sprinkler by other trade contractors could have caused the leak, but that this "could have been avoided with more complete threading of the fire sprinkler on installation."

some leaks separated by a few days, others by as much as seven weeks).    But they offer no authority or argument showing why the policy language should be read so narrowly.    At most, a reasonable argument could be made in favor of Defendants' reading, but it is plainly not the only reasonable one, and that means the Court must accept the interpretation favoring coverage.    *See S.-Owners Ins. Co. v. Wall 2 Walls Const., LLC*, 592 F. App'x 766, 770 (11th Cir. 2014) (holding that the word "similar" was ambiguous in that it encompassed varying degrees of likeness, and that under Florida law, "where reasonable interpretations compete, the insured wins") (citing *Auto Owners Ins. Co. v. Anderson,* 756 So. 2d 29, 34 (Fla. 2000)).

The Court also rejects Defendants' argument that *Koikos v. Travelers Ins. Co.*, 849 So. 2d 263 (Fla. 2003), demonstrates that each leak constituted a separate occurrence.    *Koikos* involved a liability policy with a per-occurrence coverage limit. The policy defined an "occurrence" as an "accident," but did not define "accident." In that context, the court held that "occurrence" referred to "the act that causes the damage, which is neither expected nor intended from the standpoint of the insured." *Id*. at 271.    The court further held there is one "occurrence" when there is a single, immediate, proximate cause of the loss.    *See id*. at 270-271.    Based on *Koikos*, Defendants argue that here there was no such single, immediate proximate cause of Plaintiffs' loss; rather each leak was itself the discrete and immediate cause of a loss.

As the Florida Supreme Court has observed, however, "[t]he role of precedent

in insurance policy interpretation cases depends largely on whether the underlying facts and the policies at issue in the two decisions are similar." *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 882 (Fla. 2007).   The policy provision here provides that a loss is deemed to result from one occurrence when it (1) *directly or indirectly* results from (2) *a series of similar causes or events*.   This language, absent in *Koikos*, plainly precludes limiting an "occurrence" to a single, proximate cause of loss.   In fact, *Koikos* strongly suggested that had such language been included in the policy at issue there, the result in that case would have been different.   *See Koikos*, 849 So. 2d at 272.   The other cases Defendants rely on similarly involve different facts and different policy language from those presented here.

Accordingly, under the Policies' definition of "occurrence," the leaks at issue together constituted one occurrence.   For damage from leaks that occurred prior November 30, 2019, therefore, a single deductible of $50,000 applies.   The result is different, however, for leaks after that date, because the parties expressly modified the Policies at that point.   The original policy term ended on November 30, 2019. Plaintiffs were only entitled to purchase an extension of coverage beyond that date on the same terms as before if no "risk aggravating situation" was present at the time of the extension.   But such a situation was present, because Plaintiffs had reported multiple leaks, and that was obviously the reason the parties changed the water damage deductible to $250,000 when they extended coverage to January 30, 2020.   It is clear that the increased deductible was intended to apply to similar

water damage events occurring during the extended policy period.   Therefore, the increased deductible applies to water damage from leaks occurring after November 30, 2019, notwithstanding the definition of "one occurrence."

Accordingly, summary judgment is granted for Plaintiffs and against Defendants to the extent that the Court rules the leaks giving rise to Plaintiffs' loss constituted one occurrence under the definition of "occurrence," albeit with a $50,000 deductible applying to leaks before November 30, 2019, and a $250,000 deductible applying to leaks after that date.

***"Extra Expenses"***

In addition to providing coverage for repairs required due to water damage, the Policies included an extended coverage provision for "Expediting and Extra Expenses" as follows:

> In the event of direct physical LOSS insured hereunder, and occurring during the Policy period, the Company will pay for the reasonable and necessary extra costs to make temporary repairs, and to expedite the permanent repair or replacement of the insured property which is damaged by an insured peril; including additional wages for overtime, night work, and work on public holidays and the extra costs of express freight or other rapid means of transportation.   In addition, the Company will pay for the reasonable and necessary Extra Expense incurred during the period of restoration and repair that are over and above the total costs that would normally have been incurred during the same period of time had no direct physical LOSS occurred. Extra Expense shall include equipment rental, emergency expenses, temporary use of property, demobilization and remobilization of equipment and facilities and other expenses necessarily incurred to reduce LOSS; excluding however, any coverage provided by the Delay in Opening Endorsement if endorsed to this Policy.

Based on the plain language of this provision, the requirements for covered "Extra Expenses" are that they be: (1) reasonable and necessary, (2) incurred during the period of restoration and repair, and (3) over and above the total costs that would normally have been incurred during the same period of time had no direct physical loss occurred.   Defendants argue that Extra Expenses are further limited to "equipment rental, emergency expenses, temporary use of property, demobilization and remobilization of equipment and facilities and other expenses necessarily incurred to reduce LOSS."   However, the provision states that Extra Expenses "shall include" the listed items; it does not say that Extra Expenses are limited to those items.   *See, e.g., Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1151 n.13 (11th Cir. 2014) ("[T]he word *include* does not ordinarily introduce an exhaustive list . . . . ") (quoting A. Scalia, B. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012)); *Project Vote/Voting for Am., Inc., v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) ("[T]he term 'shall include' sets 'a floor, not a ceiling.'   Courts have repeatedly indicated that 'shall include' is not equivalent to 'limited to'") (citations omitted).

Plaintiffs, therefore, have persuaded the Court that recoverable Extra Expenses are not as limited as Defendants argue.   However, on the current record, Plaintiffs are not entitled to summary judgment awarding them the claimed Extra Expenses.   Plaintiffs' summary judgment motion primarily argued that the

expenses were not subject to exclusion as consequential loss, but offered little or no explanation or evidence as to the specific amounts claimed or why they were reasonable, necessary, and over and above the total costs that would have been incurred but for the leaks.   Even considering the entire record on both summary judgment motions, and reading the Extra Expenses provision as Plaintiffs argue, issues of fact remain.

In addition, the existing briefing and argument has not sufficiently addressed the interpretation and application of the Extra Expenses provision in light of the provisions relating to coverage of repair costs, coverage of contract penalties, and the exclusion of consequential loss, including delay.   Accordingly, to the extent Plaintiffs seek summary judgment for breach of contract, including recovery of management, overhead, and contract penalty costs, their motion is denied.

It is therefore

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   "Plaintiffs' Motion for Summary Judgment, Incorporated Statement of Facts and Memorandum of Law" (Doc. 36) is **GRANTED IN PART** to the extent set forth herein, and **OTHERWISE DENIED**.

(2)   "Defendants' Motion for Summary Judgment and Supporting Memorandum of Law" (Doc. 38) is **DENIED**.

(3)   The parties are directed to participate in mediation on or before April 14, 2023, in light of the rulings in this Order.

Page 13 of 14

(4)    The Court by separate notice will set a status conference to discuss

further briefing and pretrial and trial deadlines.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 10th day of

March, 2023.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**